People v Austin (2022 NY Slip Op 01306)





People v Austin


2022 NY Slip Op 01306


Decided on March 2, 2022


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 2, 2022
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

COLLEEN D. DUFFY, J.P.
CHERYL E. CHAMBERS
LINDA CHRISTOPHER
JOSEPH A. ZAYAS, JJ.


2018-02487
2018-02488
2018-02489
(Ind. Nos. 881/15, 8803/15, 8812/15)

[*1]The People of the State of New York, respondent,
v
Laurence Austin, appellant. 


Patricia Pazner, New York, NY (Samuel Barr of counsel), for appellant.
Eric Gonzalez, District Attorney, Brooklyn, NY (Leonard Joblove, Sholom Twersky, and Anthea H. Bruffee of counsel), for respondent.



DECISION & ORDER
Appeals by the defendant from three judgments of the Supreme Court, Kings County (Guy J. Mangano, Jr., J.), all rendered December 8, 2017, convicting him of (1) criminal possession of a weapon in the second degree, upon a jury verdict, under Indictment No. 8803/15; (2) robbery in the first degree, upon his plea of guilty, under Indictment No. 8812/15; and (3) criminal possession of a weapon in the second degree, upon his plea of guilty, under Indictment No. 881/15, and imposing sentences. The appeal from the judgment rendered under Indictment No. 8803/15 brings up for review the denial, after a hearing (Myriam Cyrulnik, J.), of that branch of the defendant's omnibus motion which was to suppress physical evidence.
ORDERED that the judgment rendered under Indictment No. 8803/15 is reversed, on the facts, the judgments rendered under Indictment Nos. 881/15 and 8812/15 are reversed, on the law, that branch of the defendant's omnibus motion under Indictment No. 8803/15 which was to suppress physical evidence is granted, that indictment is dismissed, and the matter is remitted to the Supreme Court, Kings County, for the purpose of entering an order in its discretion pursuant to CPL 160.50 under Indictment No. 8803/15, and to afford the defendant an opportunity to withdraw his pleas of guilty under Indictment Nos. 881/15 and 8812/15.
According to testimony elicited at the suppression hearing conducted with respect to Indictment No. 8803/15, at approximately 7:00 p.m., on August 31, 2015, Police Officers John Ramos and Angel Pimentel pulled over a minivan, after it drove through a red light at an intersection in Brooklyn. Ramos noticed "some writing on the [minivan's] license plate," and suspected that it "might have been forged." Pimentel, for his part, believed that the registration sticker had been "tampered with." The People stipulated at the hearing, however, that the defendant had rented the minivan, and the People did not rely on the supposedly forged license plate or registration sticker in support of their argument that the vehicle was lawfully searched.
Ramos and Pimentel approached the minivan at the same time. Pimentel went to the [*2]driver's side, and Ramos to the passenger side. As they approached, both officers noticed, through tinted windows, a passenger moving around near the middle row of seats. Pimentel arrived at the front driver's side window and Ramos arrived at the front passenger side window at the same time; both windows were rolled down.
According to Ramos, at that point, the defendant was sitting in the front passenger seat, and made "small talk with [Ramos]." Pimentel's account differed significantly. He testified that the defendant was seated in the middle of the seat in the minivan's middle row, "mak[ing] a furtive movement." More specifically, Pimentel said, he observed the defendant "place what appeared . . . to be a black firearm inside a bag that was seated in front of him," before the defendant moved into the front passenger seat. Ramos, as mentioned, did not see the alleged concealment. Nor did he see a gun.
Pimentel did not say anything to the men in the car about what he suspected he saw. Instead, he asked the driver, Ramel Thompson, for his license and registration. Pimentel then signaled to Ramos to return to the patrol car. There, Pimentel told Ramos that he "believed that there was a firearm inside [the minivan]"—though, according to Ramos, Pimentel did not say that he had seen the defendant handle the gun or attempt to hide it in a backpack—and they needed to radio for an additional unit to assist them.
Pimentel called for backup. He did not indicate in the radio transmission that he suspected that there was a gun in the minivan they had stopped. According to Ramos, this was because the officers felt that one backup unit would suffice to address the situation, and that the multiple units that would respond to a report of a gun might alarm the defendant and Thompson and escalate the situation.
When two backup officers arrived on the scene approximately one to two minutes after the call, Pimentel "told them [he] felt there was a firearm in [the] vehicle," and they needed to "take the subjects out of [the minivan] and place them in custody." Pimentel instructed the officers that they would remove Thompson from the vehicle first, and then the defendant.
Pimentel and one of the backup officers approached the driver's side of the vehicle, while Ramos and the other backup officer went to the passenger side. Thompson refused multiple requests to exit the minivan, so Pimentel sprayed Thompson with pepper spray and then pulled him out of the vehicle. Thompson struggled with the officers outside of the minivan and resisted being handcuffed. The backup officer who was with Ramos went to the driver's side of the minivan to assist. At that point, the defendant fled. Ramos gave chase, but was unable to catch him.
Once Thompson was securely in custody, Pimentel transmitted a radio message that a gun had been recovered, even though he later testified that, at the time he made the radio transmission, he had not yet searched the minivan or otherwise confirmed that what he thought he had seen the defendant conceal in the bag was, in fact, a gun. He admitted that the radio transmission was "[t]echnically" inaccurate.
At approximately 10:00 p.m., Pimentel drove the minivan back to the 67th Precinct station house. There was an open backpack on the floor, in front of the seat in the minivan's middle row. The backpack contained a taser. The taser's black grip resembled the handle of a gun. When Pimentel moved the backpack, he discovered a handgun beneath the front passenger seat.
Later that evening, Ramos prepared a complaint report, under Pimentel's supervision. The report stated that the "perp[']s vehicle had a forged license plate," and that a loaded firearm had been recovered during "a search incident to a lawful arrest."
Since the People had failed to disclose to the defendant, prior to the commencement of the suppression hearing, certain potentially inconsistent statements made by Pimentel, the Supreme Court reopened the hearing several months later. At the reopened hearing, Police Officer John Denora testified that he had responded to the scene of the car stop on August 31, 2015, and had [*3]spoken with Pimentel. Denora stated that he included the information he received from Pimentel in a search warrant application. The affidavit that Denora signed stated that he had been informed by Pimentel that, during the car stop, Pimentel had observed the passenger of the minivan "pushing an unknown object under the front passenger seat." At the reopened hearing, however, Denora testified that Pimentel had told him that he had seen the rear passenger of the minivan "making [furtive] movements, bending down . . . underneath the seat," and "putting something into a bag under his legs." Pimentel also testified at the reopened hearing. He denied telling Denora, or any other officer at the scene, that he had seen the defendant push an unknown object under the front passenger seat.
Finding the testimony of Ramos and Pimentel to be credible, the Supreme Court denied that branch of the defendant's motion which was to suppress the evidence recovered from the minivan. Although the defendant emphasized in his posthearing submission that Ramos's and Pimentel's accounts were contradictory as to what the defendant was doing when the officers first approached the front of the minivan, the court did not attempt to resolve the inconsistency. The court did acknowledge, however, that Denora's search warrant affidavit contained information that "was not entirely consistent" with Pimentel's testimony that he saw the defendant handling a gun in the middle row of the minivan. In any event, the court concluded that the minivan had been lawfully stopped for a traffic violation and that Pimentel's observations of what he suspected was a gun justified the search pursuant to the automobile exception to the warrant requirement (see People v Rodriguez, 221 AD2d 574, 574). In light of this determination, the court did not address the People's alternative contentions for denying suppression.
The defendant was convicted, after a jury trial, of one count of criminal possession of a weapon in the second degree. The jury acquitted him of criminal possession of a weapon in the fourth degree, which charge was predicated on his alleged possession of the taser. After the verdict but prior to sentencing, the defendant resolved two additional pending indictments with pleas of guilty to criminal possession of a weapon in the second degree under Indictment No. 881/15, and robbery in the first degree under Indictment No. 8812/15. The Supreme Court promised the defendant that the 10 year sentences for each of those convictions would run concurrently with each other, and concurrently with the 10 year sentence it intended to impose in connection with his conviction after trial under Indictment No. 8803/15. The promised sentences were imposed in December 2017. The defendant appeals.
On a motion to suppress physical evidence, the People bear the burden of establishing the legality of police conduct in the first instance (see People v Maiwandi, 170 AD3d 750, 751). "Implicit in this concept is that the testimony offered by the People in first presenting their case must be credible" (People v Nelson, 199 AD3d 708, 709 [internal quotation marks omitted]). Where the credibility of police testimony at a suppression hearing is undermined to such an extent that "it is unclear exactly what happened," the People have not met their initial burden of demonstrating that the police acted lawfully (People v Lebron, 184 AD2d 784, 787).
Here, the Supreme Court credited the accounts of both Ramos and Pimentel and concluded that what Pimentel testified that he had observed gave the officers probable cause to search the minivan for a gun (see People v Galak, 81 NY2d 463, 467). However, the officers' versions of events sharply conflicted with each other as to where the defendant was sitting in the minivan, and what he was doing, when the officers arrived at the minivan's front windows. According to Ramos, the defendant was sitting in the front passenger seat, while Pimentel claimed that the defendant was sitting in the middle row, and attempting to conceal a gun in a bag at his feet. Ramos, though, did not see a gun, furtive movements, or a bag. It seems improbable that, if the defendant did what Pimentel said he did, Ramos could somehow have failed to notice it.
Ramos's and Pimentel's accounts both could not have been true, since both officers acknowledged that they approached the minivan simultaneously and reached the front seats at the same time. However, the Supreme Court made no attempt to reconcile the conflicting testimony. Even if it had, these sorts of "multiple choice questions are neither desirable nor acceptable, and the factfinder should refuse to select a credible version based upon guesswork" (People v Rhames, 196 [*4]AD3d 510, 514 [internal quotation marks omitted]). Indeed, even if, contrary to the officers' testimony, Pimentel arrived at the front of the minivan slightly before Ramos, that would not credibly account for the significant differences in the officers' accounts.
Aside from the conflicting testimony, other evidence elicited at the hearing further undermined the believability of Pimentel's account. Perhaps most significantly, the belatedly disclosed search warrant affidavit that Denora signed indicated that he had been informed by Pimentel that Pimentel had seen the defendant "pushing an unknown object," rather than a gun, under the front passenger seat of the minivan (see Matter of Robert D., 69 AD3d 714, 717). Such evidence strongly suggests that all Pimentel could see was the defendant moving an unidentifiable object just before the defendant moved from the seat in the middle row of the minivan to the front passenger seat.
Not every conflict between information contained in police paperwork and an officer's hearing testimony will cast significant doubt on the officer's credibility (see e.g. People v Houston, 177 AD3d 902, 903; People v Rosa, 179 AD2d 538, 538). When, however, an officer submits an affidavit in connection with a search warrant application, as Denora did here, it is reasonable to infer that the officer has ensured the accuracy of the information in the affidavit (cf. Franks v Delaware, 438 US 154, 171). As discussed, Denora's affidavit contained information that conflicted with Pimentel's hearing testimony on a critical factual point. That inconsistency, then, should have been given substantial weight by the Supreme Court.
Moreover, if Pimentel had in fact seen a gun, it is unlikely he would have waited several hours, until he drove the minivan back to the station house, to confirm as much, as he said he did in his testimony. But that aspect of Pimentel's account was also questionable, since he transmitted a message over the police radio, from the scene of the car stop, that a gun had been "recovered"—well before he returned to the precinct. The complaint report that Ramos offered also cast doubt on the series of events described by Pimentel, since it suggested that the minivan had been searched not because Pimentel had seen a gun, but, rather, incident to an arrest for a forged license plate (see People v Rhames, 196 AD3d at 513).
Given these inconsistences, it is impossible to determine "exactly what happened" (People v Lebron, 184 AD2d at 787) and what Ramos and Pimentel saw when they approached the minivan, and, consequently, whether the search of the vehicle under the automobile exception was lawful. Therefore, although we ordinarily defer to credibility determinations made by the hearing court (see People v Frazier, 140 AD3d 977, 977-978), in the circumstances of this case, we conclude that the branch of the defendant's omnibus motion which was to suppress the handgun should have been granted (see People v Jones, 164 AD3d 1363, 1367). We note that, since the Supreme Court did not rule on the People's alternative contentions for denying suppression, we lack the authority to address those contentions (see People v LaFontaine, 92 NY2d 470, 474), and the People do not request that the case be remitted to the Supreme Court for further proceedings on those issues (cf. People v Holmes, 170 AD3d 532, 533). Without the suppressed evidence, there was insufficient evidence to prove the defendant's guilt of criminal possession of a weapon in the second degree under Indictment No. 8803/15. Since the jury acquitted the defendant of the other count charged in that indictment, that indictment must be dismissed and the matter remitted to the Supreme Court, Kings County, for the purpose of entering an order in its discretion pursuant to CPL 160.50 (see People v Soler, 189 AD3d 1086, 1088).
Finally, as the People acknowledge, the defendant should be afforded an opportunity to withdraw his pleas of guilty, under Indictment Nos. 881/15 and 8812/15, since they were induced by the promise that the sentences would run concurrently with the sentence imposed upon the conviction rendered after trial (see People v Griffin, 119 AD3d 605, 606).
The defendant's remaining contentions need not be reached in light of our determination.
DUFFY, J.P., CHAMBERS, CHRISTOPHER and ZAYAS, JJ., concur.
ENTER:
Maria T. Fasulo
Clerk of the Court