People v Lewis (2025 NY Slip Op 05823)

People v Lewis

2025 NY Slip Op 05823

Decided on October 22, 2025

Appellate Division, Second Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on October 22, 2025
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

BETSY BARROS, J.P.
FRANCESCA E. CONNOLLY
CHERYL E. CHAMBERS
ROBERT J. MILLER, JJ.

2019-11790 ON MOTION
 (Ind. No. 1010/18)

[*1]The People of the State of New York, respondent,
v
Shawn Lewis, appellant. DECISION & ORDER Motion by the defendant for leave to reargue an appeal from a judgment of the Supreme Court, Queens County, rendered September 12, 2019, which was determined by decision and order of this Court dated August 10, 2022. Upon the papers filed in support of the motion and the papers filed in opposition or in relation thereto, it is ORDERED that the motion is granted, and, upon reargument, the decision and order of this Court dated August 10, 2022 (People v Lewis, 208 AD3d 595), is recalled and vacated, and the following decision and order is substituted therefor: Patricia Pazner, New York, NY (Sarah B. Cohen of counsel), for appellant.

Melinda Katz, District Attorney, Kew Gardens, NY (Johnnette Traill, Roni C. Piplani, and Joseph M. DiPietro of counsel), for respondent.
Appeal by the defendant from a judgment of the Supreme Court, Queens County (Evelyn L. Braun, J.), rendered September 12, 2019, convicting him of robbery in the second degree, robbery in the third degree, grand larceny in the fourth degree (five counts), criminal possession of stolen property in the fourth degree (four counts), criminal possession of stolen property in the fifth degree (two counts), criminal mischief in the fourth degree, possession of burglar's tools (three counts), obstructing governmental administration in the second degree, resisting arrest, unlawful fleeing a police officer in a motor vehicle in the third degree, reckless driving, failing to comply with a police officer's direction, failing to stop at a steady red signal, driving a vehicle on the left side of no-passing markers, failing to signal, driving in excess of the maximum speed limit, and operating a motor vehicle without a license, after a nonjury trial, and imposing sentence. The appeal brings up for review the denial, after a hearing (Deborah Stevens Modica, J.), of that branch of the defendant's omnibus motion which was to suppress physical evidence. Justice Connolly has been substituted for former Justice Zayas (see 22 NYCRR 1250.1[b]).
ORDERED that the judgment is modified, on the law, by vacating the convictions of robbery in the second degree, robbery in the third degree, grand larceny in the fourth degree (five counts), criminal possession of stolen property in the fourth degree (four counts), criminal possession of stolen property in the fifth degree (two counts), and possession of burglar's tools (three counts), and vacating the sentences imposed thereon; as so modified, the judgment is affirmed, that branch of the defendant's omnibus motion which was to suppress physical evidence is granted, and a new [*2]trial is ordered on those counts of the indictment.
The defendant was charged with robbery in the first degree and various other offenses after he allegedly confronted the complainant on a street corner, indicated that he had a weapon, and took the complainant's wallet. When police officers responded to the scene, the defendant allegedly fled, first on foot and then in a car, and was later apprehended by other officers. The defendant was handcuffed, and a wallet was removed from his pocket. A police officer examined the contents of the wallet and determined that it was the complainant's wallet.
Prior to trial, the defendant moved, inter alia, to suppress the wallet that was recovered from his pocket and its contents. The Supreme Court conducted a suppression hearing, at which the People presented testimony from Police Officers Christopher Catapano and David Fitchik. Those officers testified that they responded to the scene after a passing delivery driver alerted them to the encounter between the perpetrator and the complainant. When the officers arrived, less than a minute after they were notified of the incident, the perpetrator was facing away from the officers, had his jacket hood up and his hand in his front right pocket, and was talking with the complainant. The perpetrator then looked over his shoulder, toward the officers, at which point he turned and began to run away, while the complainant pointed frantically at him. Catapano and Fitchik pursued the perpetrator on foot, and used their police radio to call for backup, describing the perpetrator as a "[m]ale black approximately 20 years old, 5-foot-8, dark jeans, dark jacket." After the officers pursued him for about four blocks, the perpetrator entered a white Toyota Camry with Texas licence plates, and drove away at a high rate of speed. Before the perpetrator drove away, Fitchik used his baton to break the back window of the car, to make the car more easily identifiable by other officers. The officers transmitted by radio a description of the car now being driven by the perpetrator, and then returned to the scene of the robbery, where the complainant told them that the perpetrator robbed him and took his wallet.
The officers received a radio transmission indicating that another officer had "picked up" the vehicle and directing the officers to a backyard about half a mile from the scene of the robbery. The officers drove to that location, where Police Officer Brian Nelson and his partner were present with the defendant, who was on the ground in handcuffs. Catapano testified that he saw Nelson "pat [the defendant] down to search him." According to Fitchik, the officers "were frisking [the defendant] for officer safety searching him for anything." Nelson reached into the defendant's pants pocket and recovered a wallet. Nelson handed the wallet to Catapano, who "looked through it to try and I.D. the defendant." The wallet contained credit cards, debit cards, and a work identification card, all bearing the complainant's name. Fitchik also opened the wallet and, upon examining its contents, determined that the pictures on the identification cards matched the complainant, not the defendant.
After the hearing, the Supreme Court issued a written decision denying that branch of the defendant's motion which was to suppress the wallet and its contents. The court determined that the officers had a reasonable suspicion that the defendant had committed a robbery, which justified a temporary detention of the defendant for the purpose of arranging for an identification procedure. The court reasoned that the frisk of the defendant which resulted in the recovery of the wallet from his pocket "was necessary to ensure the safety of the police officers" during that detention.
The case proceeded to a nonjury trial, at which Catapano gave testimony similar to his suppression hearing testimony. On cross-examination, Catapano acknowledged that, when he initially arrived at the location where the complainant and the perpetrator were standing, he was approximately 20 to 30 feet away from the two men. The perpetrator was facing away from Catapano with a hood over his head, and Catapano saw the perpetrator from the front only when he briefly looked over his shoulder toward the officers. Catapano testified that he could not remember whether the perpetrator was wearing a ski mask over his face. While he was pursuing the perpetrator on foot, Catapano was a little more than 15 feet behind him, and the perpetrator's back was to Catapano throughout the chase. When the perpetrator entered the white Toyota Camry, Catapano was 20 feet behind him.
The complainant testified that on the day of the incident, he was walking home from work when he noticed someone approaching him from behind. The person was wearing a green jacket with the hood pulled up over his head. The complainant could not see the person's face because the person was wearing a mask, but he believed that he was a Black man, based on part of his hand being exposed when he reached toward the complainant. The complainant tried to run away, but stopped when the perpetrator said, "If you run, I'll shoot you." The perpetrator approached the complainant with his right hand inside his jacket, and the complainant was convinced that he had a gun. The perpetrator demanded the complainant's wallet, and the complainant handed the perpetrator his wallet. As the perpetrator began to walk away, two police officers arrived, and they chased the perpetrator. A short time later, police officers showed the complainant his wallet, at a location where they had located the perpetrator. The complainant got his wallet back a couple of days later, after going to a police station and filling out paperwork.
Nelson testified at trial that he received a radio transmission requesting assistance with regard to a robbery. Based on the information he received, he canvassed a particular area, looking for a suspect in a white, four-door sedan with Texas license plates and a damaged rear windshield. Nelson spotted the vehicle at a location approximately eight blocks from the scene of the robbery. The vehicle drove past a stop sign without stopping, and Nelson attempted to pull it over. After a chase, the vehicle crashed into a stop sign, and was struck by Nelson's vehicle. The defendant emerged from the vehicle and fled on foot. Nelson caught up to the defendant and, after a struggle, was able to restrain him. The defendant was placed in handcuffs, and, after Catapano and Fitchik arrived, Nelson searched the defendant and recovered a wallet. The identification cards inside the wallet did not match the defendant, and Nelson gave the wallet to Catapano and Fitchik. Catapano testified that he showed the wallet to the complainant, who confirmed that it was his.
Catapano then examined the vehicle the defendant had been driving, and found three ski masks on the front passenger seat and floor. The ski masks formed the basis of three counts of possession of burglar's tools, which may be committed by possessing an item commonly used for facilitating offenses involving larceny by a physical taking, "under circumstances evincing an intent to use . . . the same in the commission of an offense of such character" (Penal Law § 140.35).
At the conclusion of the trial, the Supreme Court rendered its verdict, finding initially that the People proved the defendant's identity as the perpetrator beyond a reasonable doubt through circumstantial evidence. The court found the defendant guilty of robbery in the second degree, as a lesser included offense of robbery in the first degree, as well as robbery in the third degree, grand larceny in the fourth degree (five counts), criminal possession of stolen property in the fourth degree (four counts), criminal possession of stolen property in the fifth degree (two counts), and possession of burglar's tools (three counts) (hereinafter collectively the robbery-related counts). In addition, the court found the defendant guilty of criminal mischief in the fourth degree, obstructing governmental administration in the second degree, resisting arrest, unlawful fleeing a police officer in a motor vehicle in the third degree, reckless driving, failing to comply with a police officer's direction, failing to stop at a steady red signal, driving a vehicle on the left side of no-passing markers, failing to signal, driving in excess of the maximum speed limit, and operating a motor vehicle without a license (hereinafter collectively the flight-related counts). The court subsequently imposed sentence, and the defendant appeals.
The defendant contends that he was subjected to an unconstitutional search and seizure during the frisk performed by Nelson, when the officer removed the wallet from the defendant's pocket, and again when the contents of the wallet were searched. "On a motion to suppress, the People bear the burden of going forward to establish the legality of police conduct in the first instance" (People v Brown, 198 AD3d 803, 805). "Once the People have met their initial burden, the defendant bears the ultimate burden of proving the illegality of the search and seizure" (id.; see People v Berrios, 28 NY2d 361, 367). A police officer may forcibly detain a person when the officer has a reasonable suspicion that the person "is committing, has committed, or is about to commit a crime" (People v Cantor, 36 NY2d 106, 112; see Terry v Ohio, 392 US 1; People v De Bour, 40 NY2d 210, 223). A police officer who has detained a person is entitled to frisk the person's outer clothing for weapons "if the officer reasonably suspects that he [or she] is in danger of physical [*3]injury by virtue of the detainee being armed" (People v De Bour, 40 NY2d at 223; see Terry v Ohio, 392 US at 29-30; People v Shuler, 98 AD3d 695, 696). The officer "may intrude upon the person or personal effects of the suspect only to the extent that is actually necessary to protect himself [or herself] from harm while he [or she] conducts the inquiry" (People v Torres, 74 NY2d 224, 226; see People v Graham, 134 AD3d 1047, 1048).
Here, the Supreme Court properly determined that the officers had a reasonable suspicion that a robbery had been committed, and that, since the defendant was found in the distinctive vehicle in which the perpetrator had fled the scene, the officers reasonably suspected that the defendant was the perpetrator of that robbery. However, even assuming that the officers were justified in performing a protective frisk (cf. People v Smith, 187 AD3d 944, 948; People v Mais, 71 AD3d 1163, 1165), there was no justification for searching the defendant's pants pocket, reaching into it, and removing the wallet. In the course of conducting a protective pat-down based upon reasonable suspicion, "[o]nce an officer has concluded that no weapon is present, the search is over and there is no authority for further intrusion" (People v Diaz, 81 NY2d 106, 109; see People v Setzer, 199 AD2d 548, 549 ["once [the police officer] determined that the bulge was not a weapon, the search should have ended"]). There was no evidence presented at the suppression hearing that, during his frisk of the defendant, Nelson felt anything in the defendant's pocket that seemed to be a weapon or that could have posed a danger to the officers at the scene. Indeed, Nelson did not testify at the hearing. Accordingly, there was no lawful basis for removing the wallet from the defendant's pocket (see People v Smith, 187 AD3d at 948; People v Graham, 134 AD3d at 1048; People v Peart, 230 AD2d 922; People v Clark, 213 AD2d 946, 947, affd 86 NY2d 824), and that act violated the defendant's Fourth Amendment right to be free from unreasonable searches and seizures (see US Const Amend IV). The officers committed an additional constitutional violation when, after retrieving the wallet from the defendant's pocket, they opened it and conducted a warrantless search of its contents (see People v Geddes-Kelly, 163 AD3d 716, 717). Since the officers lacked the factual predicate necessary to search the defendant's pocket and the wallet's contents, the People failed to satisfy their burden of going forward to establish the legality of the police conduct in the first instance, and thus the wallet and its contents, seized as a result of that search, should have been suppressed (see People v Smith, 187 AD3d at 948).
Since the Supreme Court did not rule on the alternative grounds for denying suppression identified by the People on appeal, we lack the authority to address those contentions (see People v LaFontaine, 92 NY2d 470, 474). The People do not request that we hold the appeal in abeyance and remit the matter to the Supreme Court for consideration of their alternative contentions (see People v Austin, 203 AD3d 732), and, in any event, under the circumstances of this case, we do not deem it appropriate to do so (cf. People v Chazbani, 144 AD3d 836).
The error in failing to suppress the wallet and its contents was harmless with respect to the convictions on the flight-related counts, none of which depended upon the defendant's identity as the perpetrator of the robbery. However, with respect to the robbery-related counts, the error cannot be deemed harmless. Here, we must apply the harmlessness standard for violations of the Federal Constitution, under which an error may be disregarded only if there is no reasonable possibility that the error might have contributed to the convictions, and the error was, therefore, harmless beyond a reasonable doubt (see Chapman v California, 386 US 18, 23-24; Fahy v Connecticut, 375 US 85, 86-87; People v Crimmins, 36 NY2d 230, 237, 241). This standard differs in important respects from the New York State harmlessness standard that applies to nonconstitutional errors. Under the state standard, an error is harmless if the evidence of guilt is overwhelming and there is no "significant probability" that the factfinder "would have acquitted the defendant had it not been for the error" (People v Crimmins, 36 NY2d at 242). Thus, where there is overwhelming evidence of guilt and a nonconstitutional error occurs, the error may be overlooked as long as there is not a "significant probability" (id.) that the error had an effect on the factfinder, but where a constitutional error occurs, the error may be overlooked only if there is no "reasonable possibility" that the error had an effect on the factfinder (id. at 237). A "significant probability" and a "reasonable possibility" represent meaningfully different levels of likelihood. Furthermore, the standards are divergent with respect to the nature of the effect on the factfinder they contemplate. Under the standard for nonconstitutional error, where the evidence of guilt is overwhelming, an error [*4]is harmless as long as there is no significant probability that the factfinder "would have acquitted" the defendant (id. at 242). But under the standard for constitutional error, an error is harmless only if there is no reasonable possibility that the error "might have contributed to [the] defendant's conviction" (id. at 237 [emphasis added]). Thus, under the nonconstitutional standard, a finding of harmlessness is precluded only if there is a significant probability that the error made the difference between conviction and acquittal, while under the constitutional standard, an error cannot be harmless if there is a reasonable possibility that it may have been a contributing factor that influenced the factfinder's determination (see Chapman v California, 386 US at 23-24 ["An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless"]).
In this case, the complainant did not see the perpetrator's face, since the perpetrator was wearing a mask, and, at trial, the complainant did not identify the defendant as the person who robbed him. Nor did Catapano have a sufficient opportunity to view the perpetrator's face when he arrived at the scene or during the ensuing chase. Although the circumstantial evidence connecting the defendant to the robbery was strong, the evidence that the complainant's wallet—the proceeds of the robbery—was found in the defendant's pocket greatly enhanced the quantum of proof against the defendant, removing any possible doubt that he was the perpetrator of the robbery. The parties devoted a significant portion of their questioning of the witnesses to the recovery of the wallet, and, with respect to the wallet, the People requested and received a Galbo charge (see People v Galbo, 218 NY 283), under which the factfinder is permitted to infer that where a defendant is in exclusive possession of property recently stolen during a robbery, that possession resulted from the defendant's participation in the robbery (see People v Grayson, 138 AD3d 1250, 1252). Under these circumstances, regardless of whether there was sufficient evidence of the defendant's guilt without the wallet (see Fahy v Connecticut, 375 US at 86), it is reasonably possible that the admission of this powerful, crucial corroborating evidence "influenced the [factfinder] adversely to [the defendant]" (Chapman v California, 386 US at 23). Indeed, even if the evidence of the defendant's guilt on the robbery-related counts, in the absence of the erroneously admitted evidence, could be considered overwhelming, that does not resolve the separate inquiry as to whether there is a reasonable possibility that the admission of the wallet "contributed" to the convictions on those counts (People v Crimmins, 36 NY2d at 240-241 ["however overwhelming may be the quantum and nature of other proof, the error is not harmless under the Federal test if there is a reasonable possibility that the error might have contributed to the conviction" (alterations and internal quotation marks omitted)]). Since such a possibility exists here, we cannot conclude that the error in failing to suppress the wallet and its contents was harmless beyond a reasonable doubt (see Chapman v California, 386 US at 24).
Accordingly the convictions of robbery in the second degree, robbery in the third degree, grand larceny in the fourth degree (five counts), criminal possession of stolen property in the fourth degree (four counts), criminal possession of stolen property in the fifth degree (two counts), and possession of burglar's tools (three counts), and the sentences imposed thereon, must be vacated and a new trial ordered on those counts.
The defendant's remaining contentions are without merit (see People v Porto, 16 NY3d 93, 99-100; People v Milonovich, 215 AD3d 764, 765-766; People v Argueta, 194 AD3d 857, 859; People v Suitte, 90 AD2d 80).
BARROS, J.P., CONNOLLY, CHAMBERS and MILLER, JJ., concur.
ENTER:
Darrell M. Joseph
Clerk of the Court